UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 20-14351-CIV-CANNON/MCCABE

JOHN S. CAMMALLERI,

Petitioner,

v.

SECRETARY MARK S. INCH,

Respondent.
_________________________________/

**REPORT & RECOMMENDATION**

THIS CAUSE comes before the Court upon John S. Cammalleri's ("Petitioner") Petition for Habeas Corpus under 28 U.S.C. § 2254 ("Petition") [DE 1], which was referred to the undersigned by United States District Judge Aileen M. Cannon [DE 19]. Mark Inch, Secretary, Florida Department of Corrections ("Respondent"), filed a response to the Petition [DE 12], an appendix [DE 13], and transcripts [DE 14]. Petitioner replied to the Petition. [DE 17]. For the reasons set forth below, the undersigned respectfully **RECOMMENDS** that the Petition be **DENIED.**

## I. BACKGROUND

### A. Criminal Charges

In August 2016, the State Attorney for Nineteenth Judicial Circuit, in and for Indian River County, Florida, charged Petitioner, by way of an amended information, with one count of sexual battery on a child under 12 by a perpetrator 18 or older, a capital felony, in case number 312014CF000067A. [Ex. 1].[1] The offense allegedly occurred between January 1, 2013 and

---

[1] Exhibits ("Ex.") are located at DE 13-1; Pretrial and Trial Transcripts ("T.") are located at DE

December 27, 2013, and the victim of the offense was Petitioner's granddaughter, MK. [Ex. 1].

### B. **Pretrial Motions**

Prior to trial, the State filed a motion *in limine* to exclude, *inter alia*, any testimony regarding the results of a Computer Voice Stress Analyzer ("CVSA") test, a type of polygraph test, conducted on December 27, 2013. [Ex. 4]. The trial court held an evidentiary hearing on the motion on June 9, 2016, which was continued and concluded on June 15, 2016. [Ex. 4]. During the hearing, the following facts were established:

- Detective Garrison primarily conducted the CVSA interview. [T. 15; T2.].
- Petitioner made no admissions during CVSA interview. [T2.].
- When Detective Garrison left the interview room, Detective Partee spoke to Petitioner. [T. 245]. Detective Partee reminded Petitioner, that "at any point whenever you're ready, you can take off," but Petitioner stated, "No, I'm gonna answer your questions." [T2. 45-46]. Detective Partee continued, "I wanna make sure that you and I are on the same page on all of this [c]ause the results of the test aren't – aren't looking to[o] good." [T. 245].
- In fact, however, the CVSA result had shown "no deception" when Petitioner answered "no" to the following question: "[h]ave you ever placed any of your fingers inside of MK?" [T. 61-62, 236].

After the evidentiary hearing, the trial court granted the motion in part, ruling as follows:

> [T]he parties may not specifically refer to the CVSA test and results; however [Petitioner] may impeach the detective through testimony that the detective [misled] or misrepresented the truth to induce [Petitioner's] statements (detective [misled Petitioner] to believe he had failed the test before he made the statement).

[Ex. 5; T. 282-301]. The trial court reserved jurisdiction to determine the manner in which this testimony would be offered and/or proffered. [Ex. 5].

---

14-1; Computerized Voice Stress Analysis Transcript ("T2.") is located at DE 14-2.

Petitioner also filed a pretrial motion. Specifically, prior to trial, Petitioner filed a motion to suppress, arguing that the trial court should suppress certain inculpatory statements he made to police detectives at his home on January 14, 2014, and to Mrs. K (the victim's mother) on January 14, 2014, because Petitioner made those statements involuntarily and in response to improper inducements and promises by law enforcement. [Ex. 2]. On June 30, 2015, the trial court conducted an evidentiary hearing and denied Petitioner's motion, finding as follows:

> I find from the evidence, considering the totality of the circumstances, that any statements, admissions, or confessions made by the defendant during any of the four interviews, two on December 27, 2013, one on January 14, 2014, and the controlled phone call of January 14, 2014, were in fact voluntary and not the product of any police coercion or improper conduct. No express or implied promises of any kind were made by the detectives that would render the statement(s) involuntary and therefore illegal.

[Ex. 3; T. 3-166].

### C. <u>Facts Adduced at Trial</u>

The case proceeded to a jury trial in September of 2016. [T. 413-1737]. Mrs. K testified that, on the evening of December 26, 2013, her six-year-old daughter, MK, made some "horrifying" revelations to her regarding Petitioner (Mrs. K's father and MK's grandfather). [T. 820, 1291, 1293]. Once MK was in bed, Mrs. K called her mother and informed her of the allegations. [T. 821]. After Mrs. K hung up the phone with her mother, Mrs. K received a text message from Petitioner that denied MK's allegations. [T. 821-22]. The next morning, Mrs. K and her husband called the police. [T. 833]. An officer asked if they were willing to go to the police station to talk to a detective and they agreed. [T. 834].

MK testified that her "Grandpa" touched her in her room and that "something bad" happened in her room, and she said it happened "[a] lot." [T. 780-781, 783, 794]. According to

MK, Petitioner pulled her pants down while she was lying on the bed and Petitioner touched her in a bad way.   [T. 785-86, 794, 804].   MK testified that she later told her mother about what happened.   [T. 782].

Detective Partee testified that, on December 27, 2013, he separately interviewed MK.   [T. 851-52].   The interview was audio and video recorded and was played for the jury.   [T. 852-885]. During the interview, MK told Detective Partee that "Grandpa" was "playing with [her] private part" which happened in her room "with the door locked" and it happened "[a] lot."   [T. 871-75]. MK stated that Petitioner touched her private part "underneath" her underwear [T. 879], Petitioner used his hand to "play with it" [T. 880], she felt "his finger" go inside and "[h]e rubbed it" [T. 882], and she "just didn't like it" [T. 879].

<u>Controlled Call on December 27, 2013</u>

Detective Partee testified that, after his interview with MK, he asked Mrs. K if she would call her father to see if she could get him to talk about the incidents, and Mrs. K agreed.   [T. 888]. The controlled phone call of December 27, 2013 between Petitioner and Mrs. K was recorded and published for the jury.   [T. 888-914].

During the phone call, Petitioner stated, "we do tickle and stuff like that and kid around" and "sometimes it gets a little rambunctious"; but he maintained he "didn't do anything."   [T. 893-94].   "I do tickle her nicely and everything too, like when she is going to sleep and stuff," and "I pat her on the butt sometimes."   [T. 895].   When Mrs. K asked, "[n]othing accidentally went inside … [l]ike your finger?"; Petitioner responded, "No … that wouldn't be an accident." [T. 896].   "[I]t never [happened] and it never will."   [T. 898].   "You have to believe me.   I would never do a thing to that girl."   [T. 912].

Interview on December 27, 2013

Detective Partee testified that he spoke with Petitioner later that day at Petitioner's home. [T. 917-18]. Detective Partee rang the doorbell, Petitioner came to the door, the detectives asked if he was willing to speak to them, and Petitioner agreed. [T. 918]. The conversation took place on Petitioner's front porch at the "first step" with the door shut behind Petitioner. [T. 1524-25]. The audio recording of the December 27, 2013 interview of Petitioner was published for the jury. [T. 919-920, 922-962].

During the conversation, Detective Partee told Petitioner, "for your knowledge, … you can go inside. You don't have to talk to me … right now." [T. 926]. Petitioner responded, "I got nothing … not to talk to you about" and continued speaking with the two detectives. [T. 926]. Petitioner told Detective Partee, "Believe me, nothing ever happened" [T. 923]; the "family" is "trying to work that through now" [T. 924]; and "we're trying to brainstorm now as to where … she's getting this from." [T. 925]. Petitioner confirmed he had been in MK's room alone with her to "put her to sleep" but never locked the door. [T. 926-27]. Petitioner told detectives that he goes in "while she's going to sleep" and he "may tickle her for a little bit while she's dozing off." [T. 926].

Detective Partee informed Petitioner that MK would be "interviewed by a team of professionals and they're going to do a physical exam on her" and they "need to get the truth out." [T. 932]. Detective Partee told Petitioner he wanted to make sure MK's allegations "didn't happen" [T. 933]; "that's where your time comes in to tell me if anything did happen at all so I can … draw the line and navigate this investigation properly" [T. 933]; and "I want to hear the truth from the horse's mouth" [T. 935].

Petitioner told Detective Partee, "one thing I remember … I was sitting next to her on the couch … she pulled her panties aside and said, this is my vagina, and I pushed them back."  [T. 936].  Detective Partee asked, "is there any possible way that you could [have] slipped inside of her on accident?"  [T. 937].  Petitioner responded, "No. That, that's no accident."  [T. 937].

Detective Partee informed Petitioner that MK's allegations were not vague and she "knew exactly what happened.  This is your time, John."  [T. 940].  Petitioner maintained, "I got nothing to tell you, though" [T. 940]; "I didn't do the kind of thing you keep talking about"; and "you keep saying, it's time" but "I don't know what to tell you.   There's nothing I did deliberately of that kind of nature."  [T. 944-45].   Detective Garrison asked, "would your finger ever go inside her?"  [T. 946].  Petitioner responded, "No.   Jesus, no."  [T. 946].

<u>CVSA Test on December 27, 2013</u>

After the interview in front of Petitioner's house, Petitioner agreed to follow the officers to the Sheriff's office to do a CVSA.   [T. 11].   Pursuant to the trial court's pretrial ruling, the jury did not hear any evidence regarding CVSA test or the outcome of it.   Instead, the jury heard only that Petitioner agreed to follow the officers to the Sheriff's office to "continue the conversation" and the jury heard the following testimony regarding the continued conversation.  [T. 1211]. Given the option of riding with the detectives or driving his own car, Petitioner chose to drive himself to the Sheriff's office.  [T. 1211].   During the interview at the Sheriff's office, Detective Partee told Petitioner that if he told the truth, he would get "forgiveness."  [T. 1241].   Detective Partee told Petitioner that if he maintained his position that MK was lying, MK might end up on psychiatric medication.  [T. 1241-42].   At one point, Detective Partee left the interview, leaving Petitioner and Detective Garrison to continue the interview.  [T. 1243].   Afterwards, Detective

Partee lied to Petitioner regarding that interview, and he "told [Petitioner] things about that specific interview that [he] knew to be false."   [T. 1243].

<u>Controlled meet on January 8, 2014</u>

On January 4, 2014, Detective Partee submitted the case to the State Attorney's Office, but the Assistant State Attorney decided further investigation needed to be completed.   [T. 962-63]. On January 6, 2014, Detective Partee received a call from MK's parents that MK was making "new accusations" involving "the same type of incidents."   [T. 963].   Based on the new accusations, Mrs. K agreed to wear "a wire" and have a "controlled meet" with Petitioner.   [T. 967-68].

Detective Partee testified that, on January 8, 2014, Mrs. K went to meet Petitioner and they spoke in the parking lot of a restaurant.   [T. 969].   The controlled meet conversation was recorded and published to the jury.   [T. 970-1036].   During that conversation, Petitioner denied all accusations and asserted that, because of his prostrate medication, he "can't ejaculate" and had lost "any kind of desire and any other activity down there."   [T. 982].   Mrs. K maintained that she needed "to know where she's getting [these ideas] from" because MK was saying it was "grandpa" [T. 982]; "she wouldn't know any of these things to even make up that story" [T. 984]; and "she would not know any of those things unless it was done to her" [T. 984].   Then the following exchange occurred:

> [PETITIONER]: But every day I'm afraid that the cops are going to come and slap cuffs on me.
>
> [MRS. K]: All right. All right. All right. Listen. There's no police involved. Okay? So there's no police involved. Okay? I don't want to get the police involved because I would hate to see you in jail –

> [PETITIONER]: But they're already involved obviously.
>
> [MRS. K]: They were involved, but I'm talking now, as our family. We all need help. If you did this, I won't go to the police.
>
> [PETITIONER]: Okay. But I did not … I did not –
>
> [MRS. K]: This will be a family issue, and we will all get help together.
>
> [PETITIONER]: I would never do a thing like that. Again, I don't know what to say.

[T. 985-86]. The conversation continued:

> [MRS. K]: Off the record. If you, if you did anything, I won't like, I don't even want to [go] to the police anymore because they pissed me off that they wouldn't do anything in the first place. I don't even want to deal with the police anymore. I'd rather deal with this just as a family.
>
> [PETITIONER]: As a family, all I can say is I did not do anything.
>
> …
>
> [MRS. K]: I want to fix this family and the only way to fix this family is I need to know the truth about something, where she could possibly be getting this from.
>
> [PETITIONER]: That I can't answer.
>
> [MRS. K]: If you, if you did it, just tell me and we'll just fix it. Okay?
>
> [PETITIONER]: I did not do anything. I would never, I can't imagine it.
>
> [MRS. K]: Would you tell me if you did?
>
> [PETITIONER]: At this point, yes, I guess I would tell you, but I didn't.
>
> [MRS. K]: I don't, I almost don't care anymore.
>
> [PETITIONER]: I mean, that's –
>
> [MRS. K]: I just want to get you help, or this family help and put our family back together. That's all I want. I don't want to see you go to jail. I don't want to see you get arrested. I don't care about the police anymore. I just want to put our

> family back together. And if you did anything, I'm your daughter –
>
> …
>
> [MRS. K]: -- you can confide in me. I will love you. You're my father. I love you no matter what.
>
> [PETITIONER]: I can't say I did something if I didn't do it. I mean, I don't know what you want from me.
>
> [MRS. K]: I just want to know the truth. And I'm, I'm, I'm sorry I'm pounding on you, but you're Grandpa.
>
> [PETITIONER]: I know.
>
> …
>
> [MRS. K]: You're their only Grandpa. And I just need to know the truth. I want to put this family back together so the kids can have a Grandpa.

[T. 990-92].

Throughout the conversation, Mrs. K maintained that she just wanted "to fix the family" [T. 1003]; that if Petitioner told her he did it, she would "not be mad at" him [T. 1008]; and that she is "not going to go to the police … I just want my family back" [T. 1008]. Petitioner maintained his position that, "If I did … I would tell you, [because] you already said you're not going to do anything about it legally or anything like that." [T. 1009]. In concluding the conversation, Mrs. K again tried to reassure Petitioner, "I just wanted to make sure you knew that I, I don't care about the police anymore. And if you did it, just tell me and we'll work it … through as a family and that's it." [T. 1028]. The recording ended with Petitioner again denying he had done any of the things MK accused him of doing. [T. 1028-36].

Interview on January 14, 2014

Detective Partee testified that he next spoke with Petitioner on January 14, 2014 at Petitioner's home. [T. 1039-40]. Like before, Detectives Partee and Garrison talked to Petitioner outside on his front porch during the day. [T. 1040-42]. Petitioner's wife was home and "was kind of in and out of the interview." [T. 1041]. This interview was also recorded and published to the jury. [T. 1110-36]. During the conversation, Detective Partee told Petitioner that he believed MK's accusations because "what reason is there for a six-year-old to make this stuff up?" [T. 1113-14]. Petitioner told Detective Partee, "Let me get in touch with [Mrs. K] and we'll see what we can discuss and straighten out." [T. 1115]. Detective Partee responded, "Well … whether you tell me the truth or not, you need to be honest with your family." [T. 1115]. When Petitioner continued that he would call his daughter and they would straighten it out together, the following exchange took place:

> DETECTIVE PARTEE: You got to be honest with your wife. Whether you're telling me the truth or not, you need to be honest with your family so they can heal. You understand? I mean, right now, in my eyes, you're a monster. And I hate to say that, but you are.
>
> [PETITIONER]: Well, I guess from your point of view I can understand that.
>
> DETECTIVE PARTEE: I mean, I believe [MK] wholeheartedly, one hundred percent. There's no doubt in my mind she's telling me the truth.
>
> [PETITIONER]: Yeah.
>
> DETECTIVE PARTEE: There's nothing more that I'd like to do than turn you around and put handcuffs and take you to jail.
>
> [PETITIONER]: (Inaudible.)
>
> DETECTIVE PARTEE: Okay? You need to be honest with your family.

[PETITIONER]: We'll straighten it out with the family.

[T. 1116-17].

While Detective Partee was telling Petitioner why he believed MK's accusations, Petitioner's wife came out the front door and asked what was going on.  [T. 1117-18].  When Detective Partee tried to explain to Petitioner's wife why he believed MK, Petitioner attempted to bring the conversation to a close by stating, "we'll get in touch with [Mrs. K]."  [T. 1119]. Detective Partee once again reiterated that, "[w]hether he tells me the truth or not, he needs to be honest with his family so you guys can heal as a family."  [T. 1120].

Detective Garrison told Petitioner and his wife, "nobody, at this point, I mean, even removing us, nobody wants to see him go to jail, including his own family … we're going to keep fighting our case … because … the family wants that because he's not admitting anything."  [T. 1120].   The detective indicated MK had met with the Child Protection Team and "they" are going to do "physical" tests on her, and if they get Petitioner's DNA from those tests, Petitioner is "done" [T. 1120-21]; and that "this case is done, you're going to go to jail, on our count, not on the family's count" [T. 1121].   Detective Garrison theorized that, unlike the two detectives, the family wants to know the truth so they can begin the healing process and get Petitioner counseling.  [T. 1121]. However, with the detectives it was different:

> DETECTIVE GARRISON: The second we come and put the child through that [and] we're able to discover any evidence, we remove the family.  We're done [with the family].  I don't care what they say, we're going to put you in prison. And that's what [Detective Partee] [is] telling you today.   So that's why you have to make decisions for your family.
>
> [PETITIONER]: You're saying –
>
> DETECTIVE GARRISON: You got to come clean with them.  You got to tell

them what's going on so they can heal, so she can even be friends with her own daughter again. Because if that doesn't come out and we can prove that beyond that, beyond what she's just coming up with in her own mind because it did happen, you don't have, you don't have a chance in hell of any kind of life beyond that. So that's the, I'm just being more bold than what he [Detective Partee]'s telling you.

[PETITIONER]: I understand.

DETECTIVE GARRISON: But that's where it's going to go. And there's no way that you can argue at this point how your DNA got inside her vagina. You can't. You're already swore up and down your fingers have never been in there. So you're not going to be able to say –

DETECTIVE PARTEE: Accident.

DETECTIVE GARRISON: You can't explain it. I mean, it's done. So that's why we're saying today, like you said, if something did happen, you got to talk to your family.

DETECTIVE PARTEE: You got to come clean. You got to be truthful, honest.

[PETITIONER]: And, and what happens then with you guys?

DETECTIVE PARTEE: If you're honest with your family? They have to tell me that stuff, unless you are. Are you going to tell me that?

[PETITIONER]: Well, let me talk to them first. I want to talk to them first.

[T. 1121-22].

Detective Garrison explained to Petitioner that his family did not want anything to happen to him, but the detectives take the choice away from the family once they have physical evidence. [T. 1123]. When Petitioner asked if this could be cleared up and worked out, Detective Partee responded, Petitioner "need[ed] to be honest with [his] family whether or not [the police] ever get told or not. [Petitioner] need[ed] to be honest with them." [T. 1123]. Petitioner said, "I hear you." [T. 1123]. Detective Partee told Petitioner, Mrs. K was still "using" the police because "[t]hey don't see an ending" but if Petitioner "came clean and said this and allowed to heal

together, [the police] probably wouldn't even be here.   We'd be removed (inaudible)."   [T. 1124].   Detective Partee understood Petitioner feeling scared that "something would come back to [Detective Partee] if you told [Mrs. K] what happened," but one way or another, "you have to be honest."   [T. 1124].

Thereafter, Petitioner told Detective Partee, "I'm going to call them and, and talk to them … My daughter."   [T. 1125].   Detectives urged Petitioner to be honest and "get it all off your chest."   [T. 1125].   Petitioner indicated that "this'll be straightened out" and he would "tell them what I have to tell them."   [T. 1126].   Then the following exchange occurred.

> DETECTIVE PARTEE: Okay. Well, I'm just saying, if you are, okay, the court shows mercy to people that are honest and men about these things.
>
> DETECTIVE GARRISON: If it even goes to court.
>
> DETECTIVE PARTEE:   If it gets that far.   He's exactly right.
>
> DETECTIVE GARRISON: A lot of this stuff doesn't even go here.   The family creates the healing process.   They do it here.   They don't want that getting out.   They don't want your name in the paper.   They don't want any of that stuff.   That's not what they want.
>
> [PETITIONER]: And she can, she can fix that?
>
> DETECTIVE GARRISON: Fix what?
>
> [PETITIONER]: I mean, make that happen.
>
> DETECTIVE GARRISON: Yeah.   She just tells us we're not involved.   You know, that's all.

[T. 1130].

In concluding the interview, Detective Garrison asked how many times something happened, to which Petitioner responded, "really not many," and that he had "blocked some out,"

and "I keep saying don't." [T. 1133]. Petitioner felt "horrible" and said he was "not really a monster." [T. 1134]. Detective Partee asked whether MK was "telling us the truth with the finger and all" to which Petitioner responded, "no, never inside," "touching a little bit, yeah." [T. 1135].

Petitioner started to explain, "it would start so –" [T. 1135], then caught himself and said, "I don't want to get into it with you guys. I want to get into it with them." [T. 1135]. Petitioner "really appreciate[d]" the detectives coming by [T. 1133], but said, "I don't want to see you again, though, please." [T. 1133]. After Petitioner promised to go call his daughter and talk to his wife, the detectives left. [T. 1133, 1136].

Controlled Call on January 14, 2014

From Petitioner's house, Detective Partee went to Mrs. K's house to do another controlled call. [T. 1137]. The controlled call was recorded and published to the jury. [T. 1137-38, 1140, 1142-1161]. When Petitioner referred to their prior conversation the week before, Mrs. K interrupted him saying, "You lied to me, didn't you?" [T. 1142]. Petitioner explained that when they spoke outside of the restaurant last week, he was afraid Mrs. K was "wired" and the police were going to hear and "come in the car and take me." [T. 1143, 1155]. When Mrs. K asked what Petitioner had been doing to MK, that she needs to know to get MK help, Petitioner said, "I need to get help too" … "What you were saying last week was right, I need help." [T. 1143].

Petitioner then admitted to "touching" MK's vagina, "I kissed her [vagina] a little bit", and "she could see me." [T. 1143]. When Mrs. K asked if he inserted his finger in her vagina, Petitioner said, "No. . . . just tickled her, that part there." [T. 1143-44]. Petitioner admitted it happened "maybe half a dozen times over a couple of years." [T. 1144]. Petitioner told Mrs. K

he did not want to go to jail, "I'll get help," and "everything is in your hands now. I'm at your mercy." [T. 1144]. Petitioner maintained he does not remember putting his finger in the vagina to where it would hurt. [T. 1144]. When asked if he "did oral sex on her," Petitioner responded, "I kissed her a couple of times" and "I might have licked her." [T. 1145-46].

Petitioner stated "my life now is in your hands. I want to get help." [T. 1146]. Mrs. K stated, "you did this to my daughter." [T. 1146]. Petitioner begged Mrs. K not to put him in jail. [T. 1147]. When pressed by Mrs. K to tell her what Petitioner did to MK, Petitioner said, "I touched her. I asked her to touch me … she did once or twice," but never put anything in her vagina. [T. 1148]. Petitioner stated he never put his penis inside of her but did make MK touch his penis. [T. 1154].

With Petitioner's admissions in the controlled call, Detective Partee obtained an arrest warrant for Petitioner that day. [T. 1170]. When law enforcement arrived to serve the warrant at Petitioner's home, they received information that took them to the rear of the building. [T. 1172]. Detective Partee testified that when he looked through the rear window, he observed Petitioner sitting on a couch with a bag over his head. [T. 1172]. Law enforcement forced entry into the home, removed the plastic bag tied around Petitioner's head, and took him into custody. [T. 1173]. Detective Partee testified that Petitioner stated he had taken four Unisom pills and was waiting to go to sleep. [T. 1174].

<u>Jail Admissions</u>

While in jail, Petitioner further admitted to MK's accusations during telephone conversation with his wife. Recordings of the jail calls were published for the jury during trial. [T. 1334-1466].

In a call with his wife on January 20, 2014, when his wife stated, "I don't understand any of it", Petitioner responded, "that's why what I need is help … and not prison. I don't understand it either."   [T. 1344, 1365].   The following exchange occurred:

> [PETITIONER'S WIFE]: I don't understand you … I don't know the man I married.
>
> [PETITIONER]: Even, I don't know what happened either.   That's why I need help.
>
> [PETITIONER'S WIFE]: You might [need] help, John, but you need to be punished too.
>
> [PETITIONER]: Well, that what I'm thinking.   I know.

[T. 1345].

In a call on January 22, 2014, when Petitioner's wife stated, "you're a pedophile," Petitioner responded "I need help.   I need help."   [T. 1373-76].   After Petitioner pleaded with his wife not to abandon him, the following exchange occurred:

> [PETITIONER'S WIFE]: You know, you know what you did.
>
> [PETITIONER]: Yes.
>
> [PETITIONER'S WIFE]: You're, you're guilty of it.
>
> [PETITIONER]: Yes … That's why there's something wrong … that has to be found out.   I don't know what happened.   Something snapped.   I don't know … I couldn't control myself … I know it was a bad mistake …

[T. 1380-81].

Petitioner's Trial Testimony

Petitioner testified that he had a strained relationship with Mrs. K's husband. [T. 1515]. Petitioner stated that on Christmas Eve in 2013, Mrs. K, her husband, and their children were at Petitioner's house, and Mrs. K's husband knocked over some vases, causing them to break. [T. 1516-17]. Petitioner proceeded to scold him for being clumsy. [T. 1516-17].

Petitioner testified that two days later, on December 26, 2013, he learned that MK alleged that he touched her inappropriately, and Petitioner said that he was "dumbfounded" when he heard the accusation. [T. 1519]. He was interviewed several times by law enforcement, and he firmly denied any wrongdoing. [T. 1524-31, 1538-40].

Petitioner testified that law enforcement officials came to see him on January 14, 2014, and they "seemed to be offering me a solution kind of thing." [T. 1551]. According to Petitioner, "they started saying, listen, nobody wants to see you go to jail. Your daughter, your daughter still loves you, doesn't want you to go to jail. She just wants to hear you say you did it. And if you do that, we're out of here. Just say you did it and we're out of here. You can start healing the family, help and all that stuff. But say you did it and we're gone and you guys can, as a family, work this all out." [T. 1551]. Petitioner testified that he ultimately made an admission because "I didn't think I had another option." [T. 1553]. Petitioner testified that he never touched MK inappropriately. [T. 1555].

Additional Facts at Trial

Mrs. K testified that in addition to MK, she also has a ten-year-old son and a newborn baby. [T. 1480]. Mrs. K testified that her son has had some medical problems requiring extensive medical care, including surgeries. [T. 1480]. Mrs. K stated that her son's medical attention

required her and her husband to give their son a lot of attention. [T. 1483]. Mrs. K acknowledged that during one of the recordings that was played in this case, MK was acting out because of the attention her brother was receiving. [T. 1484].

Detectives did not obtain any physical evidence that Petitioner committed sexual battery. [T. 1167-68]. Certain items from MK's bedroom were analyzed (bed linens, carpet, etc.) and no "physiological fluids" were detected. [T. 1492; 1498].

An expert in criminal interrogations and false confessions testified that detectives used a common interrogation technique called the "Reid technique." [T. 1591-1621]. The expert testified that "an extreme version of minimization is when there is a suggestion that the suspect will receive no punishment, not just lenient treatment, but no punishment at all if he confesses. And a circumstance, if that happens, that would compromise the reliability of a confession." [T. 1621]. The expert opined that Detective Garrison's statements "[i]f it even goes to court" and "[a] lot of this stuff doesn't even go here" constituted "a rather extreme version of minimization." [T. 1130, 1621].

**D. <u>Verdict & Post-Trial Filings</u>**

At the conclusion of the trial, the jury found Petitioner guilty as charged. [Ex. 6; T. 1731]. Petitioner was adjudicated guilty, and the trial court sentenced him to life in prison. [Ex. 7; T. 1739].

<u>Direct Appeal</u>

Petitioner timely filed a direct appeal of his conviction and sentence to the Fourth District Court of Appeal, raising three issues: 1) the trial court erred in denying Petitioner's motion to suppress; 2) the trial court erred in prohibiting the defense from introducing evidence that the

detectives deceived Petitioner regarding the results of his CVSA test; and 3) the trial court committed error in the final judgment imposing a civil lien. [Ex. 8, 9, 10, 11].

On November 29, 2018, the appellate court *per curiam* affirmed Petitioner's conviction without written opinion. [Ex. 12]. Petitioner subsequently moved for rehearing and rehearing *en banc*. [Ex. 13, 14]. Rehearing *en banc* was denied, but on January 23, 2019, rehearing was granted as to the final judgment imposing a civil lien. [Ex. 15, 16]. The appellate court remanded for entry of a corrected amended final judgment imposing a civil lien, but otherwise affirmed Petitioner's conviction and sentence in all respects. [Ex. 15]. The mandate issued on February 18, 2019. [Ex. 17].

Writ of Certiorari

After obtaining an extension, on May 23, 2019, Petitioner filed a petition for writ of certiorari with the United States Supreme Court, arguing that based on the totality of circumstances, the actions of the detectives rendered his confession involuntary. [Ex. 18, 19]. Petitioner alleged that "[t]he detectives engaged in a systematic approach over multiple interviews to overcome the Petitioner's free will." [Ex. 19]. Petitioner asserted that during the January 14, 2014 interview, detectives made a "specific and direct promise of leniency" to him by saying "[w]here if you came clean and said this and allowed to heal together, we probably wouldn't even be here. We'd be removed." [Ex. 19]. On October 7, 2019, the Supreme Court denied the petition. [Ex. 20].

**D. 2254 Petition**

Petitioner now seeks to attack the constitutionality of his conviction and sentence. [DE 1]. On October 6, 2020, through counsel, Petitioner filed the instant Petition under 28 U.S.C. §

2254, arguing he is entitled to Federal habeas relief based on two trial court errors: (1) the trial court erred by denying Petitioner's motion to suppress his January 14, 2014 statements; and (2) the trial court erred by prohibiting the defense from introducing evidence that detectives deceived Petitioner regarding the results of the CVSA test. [DE 1].

## II. STANDARD OF REVIEW

A petitioner carries the burden of proving entitlement to Federal habeas relief, which is a high burden to overcome. *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011). Pursuant to 28 U.S.C. § 2254(d), a petition for a writ of habeas corpus shall not be granted on any claim that was:

> adjudicated on the merits in State court proceedings unless the adjudication of the claim - -
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *Fugate v. Head*, 261 F.3d 1206, 1215-16 (11th Cir. 2001).

Under § 2254(d)(1), the term "clearly established federal law" refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision. *Hall v. Head*, 310 F.3d 683, 690-91 (11th Cir. 2002) (citation, internal quotation, and alterations omitted). Under § 2254(d)(2), a state court's factual findings can be deemed "unreasonable" only when "the direction of the evidence, viewed cumulatively, was too powerful to conclude anything but the petitioner's factual claim, and when a state court's finding was clearly erroneous." *Landers v. Warden, Atty. Gen. of Ala.*, 776 F.3d 1288, 1293-94 (11th Cir. 2015) (internal citation, internal quotation, and alterations omitted).

Under both subsections (1) and (2), "habeas relief is precluded so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id.* at 1294 (citation and internal quotation omitted). This Court must employ "a highly deferential standard for evaluating state court rulings" and "state-court decisions [must] be given the benefit of the doubt." *Id.* at 1293 (citation and internal quotation omitted).

## III.   DISCUSSION

### A.   Timeliness

The parties do not dispute, and the Court finds, that the Petition is timely. [DE 12 at 5 ("[I]t appears the Petition is timely filed")]. Petitioner's conviction became final on direct review on October 7, 2020, when the United States Supreme Court denied his petition for writ of certiorari. *See* 28 U.S.C. § 2244(d)(1)(A) (the one-year limitation period shall run from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."). Thus, the limitation period for filing a Federal habeas petition began running the next day, October 8, 2020. Absent any tolling by a "properly filed" application for state postconviction relief, Petitioner had one year from that date to file a timely Federal habeas corpus petition. As Petitioner filed his Petition on October 6, 2021, the Petition is timely. [DE 1].

### B.   Exhaustion of Remedies

The Court also finds that Petitioner has exhausted his state court remedies. Before seeking habeas relief under 28 U.S.C. § 2254, a petitioner "must exhaust all state court remedies available for challenging his conviction." *Preston v. Sec'y, Florida Dept. of Corr.*, 785 F.3d 449, 457 (11th Cir. 2015) (citation omitted). "For a federal claim to be exhausted, the petitioner must have fairly

presented [it] to the state courts." *Id.* Meaning, "to exhaust state remedies fully[,] the petitioner must make the state court aware that the claims asserted present federal constitutional issues." *Id.*

The parties do not dispute, and the Court finds, that the first claim for relief in the Petition (denying Petitioner's motion to suppress his January 14, 2014 statements) was properly exhausted. [DE 12 at 8 ("Ground One is exhausted.")]. Petitioner raised this issue in the state trial court and on direct appeal as an issue of Federal constitutional law. [Ex. 2, 9, 11]. The trial court denied relief, after which, the appellate affirmed, denied rehearing, and denied rehearing *en banc*. [Ex. 3, 15, 16]. As such, the first claim for relief raised in the Petition has been fully exhausted.

As to the second claim for relief (prohibiting the defense from introducing evidence that detectives deceived Petitioner regarding the results of the CVSA), Respondent argues this issue has not been fully exhausted. Respondent concedes that Petitioner raised the issue on direct appeal as a Federal constitutional issue, but argues that Petitioner failed to do so in the trial court. Instead, Respondent asserts that Petitioner raised the issue before the trial court *solely* as an evidentiary issue, not a constitutional one. [DE 12 at 8]. The Court disagrees.

During the evidentiary hearing on the State's motion *in limine*, defense counsel clarified it was not seeking to introduce the CVSA evidence to prove that Petitioner passed a lie detector test, but rather to show Petitioner's later admissions were not voluntary:

> You must determine from the evidence, you read it to the jury, if his statement was knowing, voluntarily made. And it says in making this determination you should consider the total circumstances, including but not limited to, and then talks about whether he was threatened, made promises or things like that. He was directly lied to and told "you failed," in an act of coercion. They opened up the door for us to now say why was this coerced, he gave, in, you know, again, we're not seeking to admit the report but we just want to be able to cross-examine, cross-examine Detective Garrison and said you were lying to him when you told him he failed the CVSA. And that's a coercive tactic they use. They brought this in and they

opened the door for it by doing that.

[T. 283]. As such, defense counsel requested:

> We're requesting that we be allowed … to bring up the CVSA with a curative instruction from the Court that CVSAs are inadmissible for results, that you're not to consider the result as valid or for any other reasons other than he was misled or lied to about those results. And you could give a curative instruction that the results are invalid, unreliable and it would cure it.

Given the above, the Court finds that Petitioner sufficiently raised this as a Federal constitutional issue. The trial court denied relief, after which the appellate affirmed, denied rehearing, and denied rehearing *en banc*. [Ex. 3, 15, 16]. Thus, Petitioner fully exhausted the issue. Accordingly, the Court will address the merits of both issues raised in this Petition.

**C. <u>January 14, 2014 Statements</u>**

As to the first issue, Petitioner argues the trial court erred by denying his motion to suppress the January 14, 2014 statements. [DE 1 at 19-25]. Petitioner argues the state court decision was "contrary to" and "an unreasonable application" of "clearly established Federal law," namely, the Due Process clause of the Fourteenth Amendment. [DE 1 at 19-25]. Moreover, Petitioner argues the state court decision resulted in an "unreasonable determination of the facts" in light of the evidence presented. [DE 1 at 19-25]. Petitioner argues the facts established that detectives engaged in a systematic approach over multiple interviews to overcome Petitioner's free will. [DE 1 at 23]. As a result, under the totality of the circumstances, the actions of the detectives rendered Petitioner's confession involuntary and inadmissible as improper "fruits of hope." [DE 1 at 23-24].

"The Due Process clause of the Fourteenth Amendment prohibits prosecutorial use of an involuntary confession." *Leon v. Wainwright*, 734 F.2d 770, 772 (11th Cir. 1984). The test for

determining whether a confession is voluntary under the Due Process clause of the Fourteenth Amendment "is whether the confession was 'extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence.'" *Hutto v. Ross*, 429 U.S. 28, 30 (1976) (quoting *Bram v. United States*, 168 U.S. 532, 542-543 (1897)).   To determine whether a given statement was voluntary or not, courts must look to the totality of the circumstances.   *Hubbard v. Haley*, 317 F.3d 1245, 1252-53 (11th Cir. 2003) (quotation omitted).   Among other factors, courts consider the defendant's intelligence and education level, the length of any detention, the nature of the interrogation, the use of any physical force, and the use of any promises or inducements by law enforcement.   *Id.*; *United States v. Bernal-Benitez*, 594 F.3d 1303, 1319 (11th Cir. 2010).

In this case, the trial court was called upon to determine whether Petitioner voluntarily made his statements on January 14, 2014.   To make this determination, the trial court conducted an evidentiary hearing on Petitioner's motion to suppress, after which, the trial court concluded:

> I find from the evidence, considering the totality of the circumstances, that any statements, admissions, or confessions made by the defendant during any of the four interviews, two on December 27, 2013, one on January 14, 2014, and the controlled phone call of January 14, 2014, were in fact voluntary and not the product of any police coercion or improper conduct. No express or implied promises of any kind were made by the detectives that would render the statement(s) involuntary and therefore illegal.

[Ex. 3; T. 3-166].

Having reviewed the record and applicable law, the Court finds that Petitioner has not met his burden of proving entitlement to Federal habeas relief based on this state court ruling.   In particular, Petitioner has not shown the ruling to be "contrary to" or "an unreasonable application" of "clearly established Federal law."   *See* 28 U.S.C. § 2254(d)(1).   Likewise, Petitioner has not

shown that the state trial court made an "unreasonable determination of the facts" in light of the evidence presented.   *See* 28 U.S.C. § 2254(d)(2).

The record shows that at the time of Petitioner's statements on January 14, 2014, Petitioner was intelligent, not in custody, located outside his own home, able to sever contact with law enforcement at any time, and not subject to any physical threat.   [T. 1110-40].   He was 61 years old, retired, and a former member of Mensa.   [T. 921, 1420, 1509, 1580].   The record also shows that the length and nature of the interview were reasonable.   The interview occurred during the day on Petitioner's front porch [T. 17, 18, 19, 1550]; Petitioner's wife was present during parts of the interview [T. 18, 20]; two officers in shirt and tie were present [T. 18, 19]; no firearms or handcuffs were displayed [T. 19]; Petitioner was not placed under arrest [T. 20]; and at the conclusion of the interview, Petitioner remained at his home [T. 20].

As to inducements or promises, Petitioner argues that the detectives promised him leniency and implied that his family would have control over the decision to prosecute him.   Petitioner claims this rendered his admissions involuntary.   The Court finds that the totality of the evidence does not support this argument.   The record shows that detectives told Petitioner they believed MK's allegations and that any evidence obtained would be turned over to the State Attorney's Office for prosecution.   [T. 1116-17].   When Petitioner asked what would happen if he "came clean" with his family, Detective Partee said, "If you're honest with your family?   They have to tell me that stuff, unless you are."   [T. 1122].   Petitioner's ultimate confession to his daughter occurred over the phone about an hour after detectives left Petitioner at his home, giving Petitioner time outside the presence of police to decide whether to make admissions to his daughter.   [T. 23, 24, 1553].   The evidence shows Petitioner was free to choose whether or not to speak with his

daughter after detectives left.

It is true that Mrs. K told Petitioner that, as long as he confessed to the sexual battery of her daughter, she did not want to involve law enforcement. However, this fact alone does not compel a conclusion that Petitioner made his statements involuntarily. *See Trejo-Lozano v. Sec'y, Dep't of Corr.*, No. 8:18-CV-2206-WFJ-JSS, 2021 WL 2895744 (M.D. Fla. July 9, 2021) (rejecting the argument that a confession was coerced when defendant's ex-wife told defendant that, if he confessed to her, they could reconcile their relationship and she would not inform the police). Even misstatements by law enforcement do not automatically render an admission to be involuntarily. *See Lewis v. United States*, 385 U.S. 206, 209-210 (1966) (holding that deceptions of law enforcement are not constitutionally prohibited); *see also United States v. Middleton*, 245 Fed. Appx. 867, 872 (11th Cir. 2007) (holding defendant's admission was voluntary where police told him they had evidence they did not actually have); *United States v. Castandeda–Castaneda*, 729 F.2d 1360, 1363 (11th Cir. 1984) (holding defendant's waiver was voluntary where agents told him that his wife had already confessed when in fact she had not).

Moreover, the fact that detectives repeatedly encouraged Petitioner to be honest with his family and to "come clean" does not automatically amount to coercive police activity sufficient to render Petitioner powerless over his free will. *See United States v. Vera*, 701 F.2d 1349, 1364 (11th Cir. 1983) ("[A] mere admonition to the accused to tell the truth does not render a confession involuntary."). Rather, in accordance with *Hubbard*, 317 F.3d at 1252-53, courts must look to the totality of the circumstances surrounding the statement.

Petitioner cites to several cases where courts concluded, based on the facts presented in those cases, that the defendant made involuntary statements. *See Day v. State*, 29 So. 3d 1178

(Fla. 4th DCA 2010) ("We find, based upon the totality of the circumstances, the confession is involuntary and due process requirements render the statement inadmissible."); *Squire v. State*, 193 So. 3d 105 (Fla. 4th DCA 2016) (remanding for new trial where the totality of the circumstances establish the confession "was the product of coercive police conduct.").   None of these cases stand for the proposition that deception automatically renders a statement involuntary.[2] Rather, deception can be considered, as one factor in the totality of the circumstances, to determine whether a given statement was made voluntarily.

The rule remains that "police deception alone does not negate voluntariness" of a confession.   *See Frazier v. Cupp*, 394 U.S. 731, 739 (1969).   Many courts have found no constitutional error following misstatements by law enforcement to a defendant.   *See United States v. Farley*, 607 F.3d 1294, 1328-29 (11th Cir. 2010) ("Misleading a suspect about the existence or strength of evidence against him does not by itself make a statement involuntary.   By contrast, statements have been held involuntary where the deception took the form of a coercive threat[.]") (citations omitted); *United States v. Haswood*, 350 F.3d 1024, 1029 (9th Cir. 2003) ("Even misrepresentations by law enforcement, while reprehensible, do not necessarily evidence coercive conduct.") (citations omitted); *see also Nelson v. State*, 850 So. 2d 514, 521-22 (Fla. 2003) (holding a confession voluntary where an investigator wrote "DNA evidence" on a "pro and con" list on a board during an interrogation even though DNA analysis had not yet been performed

---

[2] Petitioner also cites *State v. Matsumoto*, 145 Hawai'i 313, 452 P.3d 310 (Haw. 2019), which holds, under Hawaii law, that a deliberate extrinsic falsehood by law enforcement renders a confession involuntary and obviates the need for a "totality of the circumstances" analysis. *Matsumoto* applies, *inter alia*, the law under the Hawaii Constitution, and does not apply to this case.

on the evidence collected for DNA testing).

The Court finds that the state trial court correctly applied a totality-of-the-circumstances test and reasonably rejected Petitioner's argument that his admissions were involuntary.   The state trial court reasonably found that the interrogation methods, even if amounting to misleading statements, did not render Petitioner's admissions involuntary under the totality of the circumstances.   In sum, the undersigned finds that Petitioner has not met his burden to show the trial court's ruling was "contrary to" or an "unreasonable application" of Federal law, or that it was based upon an "unreasonable" determination of the facts.

**D.    CVSA Evidence**

As to the second issue, Petitioner argues the trial court erred by prohibiting Petitioner from introducing evidence that detectives lied to him on December 27, 2013 regarding the results of the CVSA test, telling him the results "didn't look too good," when in fact he had passed.   [DE 1 at 25-34].   As a result, Petitioner was prevented from relying on this deception to argue his later confessions had not been voluntary.   [DE 1 at 25-34].   Petitioner argues the state court decision was "contrary to" and "an unreasonable application" of "clearly established Federal law," namely, the Sixth Amendment right to present a complete defense and the Fifth and Fourteenth Amendment due process rights to a fair trial.   [DE 1 at 34].   Moreover, Petitioner argues the state court decision resulted in an "unreasonable determination of the facts" in light of the evidence presented. [DE 1 at 25-34].

The State's CVSA motion *in limine* required the state trial court to balance two competing interests.   On the one hand, Florida law does not allow the admission of polygraph tests in criminal trials.   *See Roger v. State*, 670 So. 2d 160, 162 (Fla. 5th DCA 1996) ("The results of polygraph

tests are not admissible in a criminal trial in Florida."). Petitioner had no right, therefore, to inform the jury that the December 27, 2013 polygraph test showed "no deception" when asked whether Petitioner had placed his fingers inside of MK. On the other hand, law enforcement misled Petitioner about the results of the polygraph test. Petitioner therefore had a legitimate interest, on Fifth, Sixth, and Fourteenth Amendment grounds, in cross-examining law enforcement agents to show the impact this may have had on his later confessions. The state trial court held a hearing to consider arguments and resolve these competing interests. At the end, the trial court struck a balance as follows:

> [T]he parties may not specifically refer to the CVSA test and results; however [Petitioner] may impeach the detective through testimony that the detective [misled] or misrepresented the truth to induce [Petitioner's] statements (detective [misled Petitioner] to believe he had failed the test before he made the statement).

[Ex. 5; T. 282-301].

At trial, Petitioner's counsel cross-examined law enforcement about the interview that took place on December 27, 2013, eliciting the fact that Detective Partee misled Petitioner regarding the interview and "told [Petitioner] things about that specific interview that [he] knew to be false." [T. 1243]. The jury also learned that Petitioner made no incriminating statements on the day Detective Partee misled him; rather, Petitioner repeatedly maintained that he had done nothing wrong and freely left the police station that day. [T2. 46, 47, 49, 50, 58, 64, 66, 68]. In closing, Petitioner's counsel argued to the jury that Petitioner's confession on January 14, 2014 had been coerced and that the December 27, 2013 misstatement by Detective Partee had been one of the factors contributing to the coercion. [T. 1693].

Having reviewed the record and applicable law, the Court finds that Petitioner has not met his burden of proving entitlement to Federal habeas relief on this argument. Rather, the Court finds that the state trial court struck an appropriate balance between Florida's evidence law, which prohibited introduction of the polygraph test results, and Petitioner's constitutional right to present a complete defense and have a fair trial. Petitioner successfully elicited the fact that Detective Partee misled him on December 27, 2013, and Petitioner argued to the jury that this misstatement contributed to an involuntary confession. While the jury rejected this argument, the Court finds no violations of Petitioner's "clearly established" constitutional rights or any "unreasonable" determinations of fact by the state court.

## IV. RECOMMENDATION

Based on the foregoing, the undersigned respectfully **RECOMMENDS** that Petitioner John S. Cammalleri's Petition for Habeas Corpus under 28 U.S.C. § 2254 [DE 1] be **DENIED**. Further, the undersigned finds no substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (a prisoner seeking to appeal a district court's final order denying a § 2254 habeas corpus petition has no absolute entitlement to appeal, and to do so, must obtain a certificate of appealability by meeting the *Slack* test). Therefore, the undersigned respectfully **RECOMMENDS** that no certificate of appealability be issued in the Court's Final Order.

## V. NOTICE OF RIGHT TO OBJECT

The parties shall have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with United States District Judge Aileen M. Cannon. Failure to file objections timely shall bar the parties from a *de*

*novo* determination by the District Judge of an issue covered in the Report and Recommendation and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report and Recommendation.   *See* 28 U.S.C. § 636(b)(1); 11th Cir. R. 3-1; *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191-92 (11th Cir. 2020).

**RESPECTFULLY SUBMITTED** in Chambers at West Palm Beach in the Southern District of Florida, this 12th day of July 2022.

RYON M. MCCABE
U.S. MAGISTRATE JUDGE